United States District Court
For the Northern District of California

1

2

3

4

5    ***E-FILED - 11/17/06***

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

| | |
|---|---|
| 12 DOUGLAS SCOTT MICKEY, | No. C-93-0243 RMW |
| 13    Petitioner, | ORDER GRANTING IN PART AND |
| 14       v. | DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART |
| 15 ROBERT L. AYERS, Warden of California State Prison at San Quentin, | CERTIFICATE OF APPEALABILITY |
| 16 | |
| 17    Respondent. | |

18

19        Douglas Scott Mickey challenges his state murder conviction and death sentence by way of

20  a petition for writ of habeas corpus.  On May 6, 2002 the court issued its Order Granting in Part and

21  Denying in Part Respondent's Motion for Summary Judgment.  The court granted summary judgment

22  in favor of respondent on all of petitioner's claims except on Claim 1 alleging ineffective assistance

23  of counsel, Claim 9 alleging that petitioner was incompetent to waive his rights when he gave a

24  statement to the police during extradition from Japan, and Claim 10 asserting that he was incompetent

25  to stand trial.  In a notice dated November 4, 2003, petitioner withdrew Claim 10 and that portion of

26  Claim 1 that alleges counsel were ineffective for not raising a doubt as to petitioner's competence at

27

trial.

An evidentiary hearing on the remaining portion of Claim 1 and Claim 9 was conducted beginning on April 27, 2004 and continuing through April 30, 2004. The court hereby denies the petition for a writ of habeas corpus on the guilt phase claims but grants it on the penalty phase claim of ineffective assistance of counsel.

## I.  PETITIONER'S CONVICTION AND SENTENCE AND DIRECT REVIEW

Petitioner was tried and convicted by a San Mateo County jury of the first degree murders of Eric Hanson and Catherine Blount. He was sentenced on September 23, 1983 to death for both murders. On October 31, 1991, the California Supreme Court affirmed the convictions and several of the special circumstance findings, as well as the death sentence. *People v. Mickey*, 54 Cal. 3d 612 (1991). Petitioner sought a writ of certiorari from the United States Supreme Court. The application was denied on October 5, 1992. *Mickey v. California*, 506 U.S. 612 (1992).

## II.  REQUESTS FOR HABEAS CORPUS RELIEF

Petitioner applied for appointment of counsel in this court on January 22, 1993. His appointed counsel filed his federal petition for habeas corpus relief on December 1, 1995. That petition included unexhausted claims, and the case was stayed pending exhaustion in state court. On June 10, 1996, Mickey filed a state petition in the San Mateo County Superior Court. It was denied on June 19, 1996 without prejudice to its being refiled in the California Supreme Court. The petition was then refiled on July 8, 1996 in the state supreme court. It was denied on December 18, 1996.

On January 31, 1997, petitioner filed again in the California Supreme Court contending that he had not received a fair and constitutionally adequate review of his death sentence. That petition was denied on February 19, 1997.

On December 18, 1997, petitioner filed an amended petition in this court.

## III.  THE MURDERS

In September 1980 Mickey was living in Japan with his wife and her two children at an Air Force Base where his wife worked as a nurse. They were having financial and marital difficulties

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                                                              2

*United States District Court*
For the Northern District of California

and on September 17, 1980, Mickey returned to California.  He stayed in Concord with Edward Rogers, a longtime friend.  Mickey disclosed several reasons to Rogers for his visit.  Primarily, he intended to rob and murder Eric Lee Hanson, a former friend, who lived in Placer County, and then to possibly travel to Alaska and kill his wife's former husband for the proceeds of a life insurance policy.

Hanson dealt in marijuana and hashish and had a business partner named Randy Hoehne. Hanson lived with his lover, Catherine Blount, in a house in a rural community.   Hoehne also lived there but slept in a tent some distance away in order to guard his and Hanson's marijuana crop. Although Mickey had in the past been a friend of Hanson, he apparently carried a grudge against Hanson because he thought Hanson had stolen certain items from his family.  In 1979, Mickey had raided Hanson's marijuana crop in retaliation.

After Mickey arrived in California in September of 1980, he retrieved the marijuana from the place where he had hidden it.  He thereafter regularly consumed marijuana along with alcohol. He discussed his planned revenge against Hanson with Rogers.

On September 22, 1980, Mickey traveled to Hanson's home in a car he had borrowed from Rogers in order to carry out his plan.  He arrived about 11 p.m.  He was armed with a rifle belonging to Rogers, which he had fitted with a homemade silencer.  Blount was alone in the house; Hanson and Hoehne were out on the property.  Blount invited defendant in.  Hanson returned and the three visited.  Hanson left the next day.  During his time at the property, Mickey observed Hanson counting "a good size stack of money."  Mickey tried to sell Hanson some of the marijuana he had stolen the year before but was unsuccessful.

On September 28, 1980, Mickey traveled with Rogers back to Hanson's home in Rogers's pickup truck.  They drove to the property where Rogers left Mickey off at about midnight.  Mickey was armed with a knife which belonged to him and a pistol belonging to Rogers. Hanson and Blount were alone in the house; Hoehne was in his tent.  Hanson and Blount greeted Mickey at the door and invited him in.

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                                    3

**United States District Court**
For the Northern District of California

1    During the early hours of September 29, 1980, evidently after Hanson and Blount went

2    to sleep, Mickey killed them.  He bludgeoned Hanson with a baseball bat and slit his throat from ear

3    to ear down to the spinal cord.  He stabbed Blount seven times in the chest in a close pattern, piercing

4    her heart with three of the blows.  Immediately thereafter, he removed a substantial quantity of

5    property from the house, loaded it into Hanson's Volkswagen, and departed to a spot where he had

6    agreed to meet Rogers.  Some distance away from the meeting place, Mickey and Rogers transferred

7    the goods to the truck Rogers had brought, wiped the Volkswagen clean of fingerprints and abandoned

8    it there.  Mickey said he wanted to go back and burn the house but Rogers persuaded him otherwise.

9        On September 30, 1980, Mickey fled the country from Travis Air Force Base and

10   returned on October 3 to the Air Force Base in Japan.  On October 2, 1980, Rogers made a statement

11   to officers at the Placer County Sheriff's Department implicating himself and Mickey in the murders

12   and related activities.  Mickey was arrested in Japan on October 14, 1980 for the murders of Hanson

13   and Blount.  He was advised of his *Miranda* rights and in response said he did not want to decide at

14   that time whether he would speak to law enforcement.  On January 16, 1981, Mickey departed Japan

15   for the United States in the custody of several law enforcement officers.

16                    **IV.  GUILT PHASE ISSUES**

17   **A.  Mickey's Alleged Incompetence to Waive Rights with Respect to Statements Made During Extradition From Japan (Claim 9)**

18

19        Mickey was flown from Tokyo to Honolulu and after an overnight stay in Honolulu brought

     to San Francisco.  During the Tokyo-Honolulu flight and later in Honolulu, Mickey made inculpatory
20
     statements to Detective Curtis Landry.  During the Tokyo-Honolulu flight Mickey and Detective
21
     Landry initially engaged in small talk but about three hours into the flight, after a lull in their
22
     conversation, Mickey asked about the burial of Hanson and Blount.  After Detective Landry answered,
23
     Mickey became emotional and made comments suggesting the murders never should have happened
24
     and that Hanson should have listened to him.  Landry remained passive during this period and said
25
     nothing.  Thereafter, Mickey regained his composure and chatted about his family, his wife and her
26

27   ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
28   C-93-0243 RMW                                              4

1  children, his hobbies and politics.  However, when Mickey was getting off the plane, he told Detective

2  Landry that he wanted to continue their conversation.  After conversing with his superior, Detective

3  Landry met with Mickey at the jail and advised him again of his *Miranda* rights.  Mickey waived his

4  rights and then Landry asked questions about the murders.  Mickey gave answers implicating himself

5  and became emotional on several occasions.  However, he seemed alert and aware and never

6  suggested that he wanted the conversation to stop.

7      At trial Mickey unsuccessfully moved to suppress his statements.  The trial court held a

8  hearing and found that Mickey had been given his *Miranda* rights before he was extradited and

9  transported to the United States, that he effectively invoked his right to counsel in Japan, and that he

10  again was given a *Miranda* warning in Honolulu.  However, the trial court concluded that the

11  statements at issue were knowing and voluntary, not the result of any "softening up," and not coerced.

12      In its review of the trial court decision, the California Supreme Court concluded that

13  petitioner's statements were made knowingly and voluntarily and were admissible.

14      Having carefully scrutinized the record, we are of the opinion that the trial
    court did not err by denying Mickey's motion to suppress the "inflight" and "Honolulu
15  admissions."

      First, after independent review we believe that Mickey's "inflight admissions"
16  were voluntary under the due process clauses of both the federal and state
    Constitutions.

17      The requisite coercive activity by the state or its agents is absent . . . . [Mickey]
    opened discussion and directed its course . . . . So far as the challenged statements are
18  concerned, Landry hardly acted at all---and manifestly did not "overreach" in any way
    . . . .

19      * * *

      [Mickey] claims he experienced ["psychological and physiological pressure"]
20  as a result of such factors as his extended incarceration in a foreign detention facility,
    his longing for his family, and the demands of travel.

21      There was no state coercion . . . . [The "pressure's"] direct and substantial
    source was Mickey's decision to flee from California to Japan in an attempt to avoid
22  apprehension for the murder of Hanson and Blount—a decision for which the state
    cannot be held responsible.

23      * * *

      In the course of his argument, defendant urges strenuously that . . . Detective
24  Landry intended to "soften" him up-i.e., to "coerce" a statement out of him by cajolery-
    --and that [he] succeeded in doing so.  The trial court made a determination to the
25  contrary---soundly in our judgment . . . .

      Second, after independent review we believe that defendant's "inflight
26  admissions" were voluntary under *Miranda*.

* * *

    . . . To be sure, defendant was in custody. But he was simply not interrogated. Plainly, there was no express questioning by any of the officers, including Detective Landry. Nor, in our view, were there any words or actions on their part that they should have known were reasonably likely to elicit an incriminating response . . . . *Miranda* . . . does not "prohibit the police from merely listening to . . . voluntary, volunteered statements" uttered by a person, whether or not in custody, "and using them against him at the trial."

* * *

    Third, after independent review we believe that defendant's "Honolulu admissions" were voluntary under the due process clauses of both the federal and state Constitutions . . . . We find absent both the requisite coercive activity by the state or its agents and the necessary causal connection between such activity and the statements in question . . . .

    Fourth, after independent review we believe that defendant's "Honolulu admissions" were voluntary under *Miranda*.

    We recognize the prophylactic rule . . . [that] "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police." There was no violation here. Defendant initiated further discussion . . . .

*Mickey*, 54 Cal.3d at 649-652 (internal citations omitted)

    Under the law applicable at the time the instant petition was filed, findings of the state court were generally entitled to a presumption of correctness. 28 U.S.C. § 2254(d)(former); *Neuschaffer v. McKay*, 870 F.2d 839, 841 (9th Cir. 1987) ("In federal habeas corpus proceedings, deference must be granted to the findings of state appellate courts as well as state trial courts.") None of the circumstances stated in section 2254(d)(1) to (7) which except findings from the presumption of correctness have been established here. Petitioner has not met the burden of persuading the court by clear and convincing evidence that the trial court's conclusion that the statements were freely and voluntarily given was erroneous. *See Tinsley v. Borg*, 895 F.2d 520, 526 (9th Cir. 1990).

    Petitioner contends that his statements were not made knowingly, voluntarily or intelligently. His contention is based primarily on the testimony of Dr. Donald Stonefeld, a psychiatrist and neurologist practicing in Wisconsin who was retained by petitioner's current counsel. Dr. Stonefeld opined that Mickey was incompetent to waive his rights as a result of the effect of his isolation in a cell in Japan, his desire to identify with his captors and his longing for human contact. Under these circumstances it is easy, according to Dr. Stonefeld, to get someone to confess. Dr. Stonefeld believes

**United States District Court**
For the Northern District of California

1    Mickey is a paranoid schizophrenic and that one with this illness tries to hide the degree of his illness

2    and "would try to act as normal as possible, and if he thought a confession looked normal, that's what

3    he'd do."  Evidentiary Hearing 228:2-10 ("EH _____").

4          Dr. Stonefeld's conclusion that Mickey's statements were involuntary is not supported by the

5    evidence.   Mickey displayed no signs of delusions or hallucinations during his inculpatory

6    conversations with Landry.  There is no evidence that Mickey was mistreated during his detention in

7    Japan.  His wife, Allison, and her three children visited three or four times, and he wrote them on

8    numerous occasions.  There is no evidence that law enforcement attempted to interrogate Mickey

9    during the flight from Tokyo to Honolulu.

10         Although Dr. Stonefeld diagnosed petitioner as a paranoid schizophrenic, he did not testify as

11   to the extent that this condition made him more likely to confess than one who did not have the illness.

12   Dr. Stonefeld presented no facts to support a finding that Mickey's statements were other than

13   knowingly and voluntarily made.

14         The circumstances existing at the time Mickey made his statements do not suggest he was

15   incompetent to make them.  The evidence shows that Mickey's comments made to Landry during the

16   flight were volunteered by Mickey and not the result of any inquiry by Landry.  The statements made

17   in Honolulu were made after a second *Miranda* warning.  There is no evidence of coercion or an

18   attempt to "soften-up" Mickey so he would confess.  There is also no evidence that Mickey did not

19   make his statements knowingly.

20         Claim 9 is denied.

21   **B.  Alleged Ineffectiveness of Counsel (Claim 1)**

22        **1.  Standard for Determining Whether Counsel Was Ineffective**

23         The test for evaluating whether counsel was ineffective is set forth in *Strickland v. Washington*,

24   466 U.S. 668 (1984).  The petitioner must establish that: (1) counsel's representation "fell below an

25   objective standard of reasonableness," and (2) that such performance prejudiced the defendant.  *Id.*

26   at 688, 694.  To establish prejudice the petitioner "must show that there is a reasonable probability

27

28

that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 693. Therefore, in the guilt phase the essential question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995). There is a strong presumption "that counsel's conduct falls within the wide range of professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002).

Petitioner was represented at trial by appointed lead counsel Fred Tuttle, the former Public Defender of Placer County, and Lyle Shattuck. Both attorneys apparently had good reputations. Tuttle died in 1999 and Shattuck is currently unable to testify or provide information concerning the case.

### 2.  Failure to Investigate and Present Mental Health Diminished Capacity Guilt Phase Defense

There is no question that Mickey committed the two brutal murders. Petitioner, however, is critical of counsels' handling of the guilt phase for essentially ignoring an allegedly viable mental health defense. Specifically, petitioner contends counsel's performance was deficient because: (a) counsel chose not to call David Axelrad, M.D., a psychiatrist, who held the opinion that Mickey was insane and suffered from diminished mental capacity; (b) counsel did not undertake an adequate mental health investigation, and an adequate one would have resulted in persuasive evidence that petitioner suffered from schizophrenia, paranoid type, and had a viable diminished capacity defense; and c) counsel presented a self-defense theory that was neither accurate nor believable and conflicted with the mitigation case.

#### a.  Failure to Call Dr. Axelrad, M.D., a Psychiatrist

Attorney Tuttle requested and obtained court authorization to hire an investigator and psychiatrist, which he did. Tuttle had Mickey examined before the preliminary hearing by Frederick

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                                    8

United States District Court

For the Northern District of California

Whipple, M.D., a forensic psychiatrist. Dr. Whipple's notes reflect that he found Mickey oriented, somewhat depressed, but not anxious. Dr. Whipple reported no compulsions, obsessions or hallucinations. After Dr. Whipple's examination of Mickey prior to the preliminary hearing, Dr. Whipple did not have any further involvement with the case. Defense attorney Tuttle thereafter retained David Axelrad, M.D., a forensic psychiatrist. Dr. Axelrad then associated Grant Hutchinson, Ph.D., a neuropsychologist, and Tom Morrison, Ph.D., a clinical psychologist, to assist in the evaluation of petitioner. Dr. Hutchinson's testing disclosed no evidence of a major affective or psychotic disorder and no evidence of organic brain dysfunction. He found Mickey to be fully oriented as to time, place and person and to have an IQ of 106 (within a normal range). None of the experts working with Dr. Axelrad diagnosed Mickey as being a paranoid schizophrenic.

Dr. Axelrad, who examined petitioner three times before trial made a principal diagnosis of organic delusional syndrome. He also found that Mickey had isolated explosive disorder and a borderline personality disorder. He concluded that Mickey was delusional and psychotic at the time of the murders and was unable to premeditate or deliberate and thus suffered from a diminished capacity.

Despite Dr. Axelrad's opinion that Mickey suffered from diminished capacity at the time of the murders, defense counsel made the tactical decision not to call Dr. Axelrad as a trial witness. The evidence establishes a number of reasons for this decision. The overriding concern was to not lose credibility, because the primary focus was on saving Mickey from the death penalty. The specific reasons for not calling Dr. Axelrad included: (1) that Mickey, in Dr. Axelrad's opinion, had a good memory and was a reliable reporter, however, he gave Dr. Axelrad a description of the murders which was inconsistent with his statement to Landry and which potentially suggested premeditation and deliberation and included a profit motive; (2) Dr. Axelrad recognized a risk that the story Mickey gave him could suggest premeditation and deliberation; (3) Dr. Axelrad was negative and defensive when asked hard questions; (4) Dr. Axelrad believed that given the right circumstances, Mickey could kill again; (5) Dr. Axelrad knew about Mickey's incestuous relationship with his mother which counsel

**United States District Court**
For the Northern District of California

1   wanted kept from the jury; and (6) Dr. Axelrad would probably be perceived as a defense-oriented

2   witness—he had testified for the defense in four capital cases and all four defendants had received the

3   death penalty.

4        Defense counsel's decision not to call Dr. Axelrad was a tactical decision to which deference

5   must be accorded.  Counsel had legitimate reasons for their decision.

6        **b.  Failure to Undertake an Adequate Mental Health Investigation Which Would
          Have Provided Evidence That Petitioner Suffered from Schizophrenia, Paranoid
7         Type, and Thus Had a Viable Diminished Capacity Defense**

8        Petitioner argues that although defense counsel retained Jules Burstein, Ph.D., a clinical and

9   forensic psychologist, and David Smith, M.D., an extraordinarily qualified and experienced specialist

10  in the study of diseases produced by drugs and the study and treatment of addictive diseases, they were

11  retained only for the penalty phase and not in time to be prepared for the guilt phase.  Petitioner asserts

12  that had Dr. Burstein and Dr. Smith been retained earlier and had they been provided available

13  materials (which counsel, to a large extent, had failed to obtain), the defense, through Dr. Burstein and

14  Dr. Smith, would have been able to present a persuasive diminished capacity defense in the guilt

15  phase.

16       California had a judicially created diminished mental capacity defense until it was abolished

17  in 1982.  The theory of the diminished responsibility defense was that

18           since deliberation and premeditation are necessary elements by definition of the crime
             of first degree murder, the defendant should be permitted to introduce evidence of an
19           abnormal mental condition, although not sufficient to establish legal insanity as a
             complete defense to or excuse for the crime, for the purpose of showing either that he
20           did not have the capacity to, or in fact did not, deliberate or premeditate the act at the
             time the homicide was committed, and that for this reason only murder in the second
21           degree was in fact committed. In support of this theory some courts have pointed out
             that voluntary intoxication is admissible for the purpose of negating a certain state of
22           mind, and have stated that evidence of an abnormal mental condition should be no less
             pertinent to the existence of a specific state of mind.

23  22 ALR § 5; *see People v. Gorshen,* 51 Cal. 2d 716 (1959); *People v. Ford*, 65 Cal. 2d 41 (1966).

24       On June 8, 1982 the defense of diminished capacity was eliminated by Initiative Measure,

25  approved by the people.

26

27  ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
    PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
28  C-93-0243 RMW                                          10

> The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged.

Cal. Penal Code § 25(a). Mickey, therefore, committed his murders when the diminished mental responsibility defense was available but he was tried at a time when, although he could assert it, the defense was no longer available to persons then committing crimes. In fact, the public as a whole in California at the time Mickey was tried was hostile to mental defenses to murder charges and frustrated with the California Supreme Court's perceived hostility to implementation of the death penalty. On November 7, 1978 seventy-two percent of the voters approved the Briggs Initiative which expanded the circumstances that called for the death penalty. In that year Dan White shot and killed San Francisco Mayor George Moscone and Supervisor Harvey Milk and was successful, to the dismay of many, in his 1979 trial of asserting the diminished mental capacity defense (popularly referred as the "twinkie defense"). As previously noted, in 1982 the voters passed the initiative abolishing the defense. Shortly after Mickey's trial, Chief Justice Rose Bird and two of her colleagues were rejected for retention at the November 4, 1986 general election, based primarily on their perceived efforts to frustrate the implementation of the death penalty. Less than forty percent of the voters supported Chief Justice Bird's retention.

Since the diminished mental responsibility defense was available to Mickey, *see People v. Pensinger*, 52 Cal. 2d 1210, 1241 (1991), the question here is whether his counsel was ineffective for failing to develop and present it more effectively. Petitioner contends that the jury would have been significantly more receptive to a diminished capacity defense if Mickey's acts occurred during a psychotic episode resulting from schizophrenia, paranoid type as opposed to during a period of drug and alcohol psychosis.

Dr. Burstein now suggests that had he been retained earlier and provided with certain available information which he was not given at the time he was retained by defense counsel, it is "quite probable" that he would have diagnosed Mickey as suffering from paranoid schizophrenia and been

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

able to support a diminished capacity defense. EH 765:19-766:5.  The information which he did not

have but was available includes the results of a September 15, 1981 MMPI administered to Mickey

consistent with a diagnosis of paranoia schizophrenia, information from Mickey's ex-wife Rochelle

Packard that when she and Mickey were together from 1973-1978 he convinced himself after reading

books of a spiritual nature that he was a spiritual warrior and had spiritual powers, and the report of

Ronald Bruce, Ph.D., a clinical psychologist at San Quentin who examined Mickey in 1983,

diagnosing Mickey as a paranoid schizophrenic.  Dr. Burstein testified that this information and other

information reflecting a long history of bizarre behavior by Mickey tend to support the conclusion that

Mickey suffered from an underlying mental disease of schizophrenia, paranoid type, and this disease

substantially contributed to his psychotic episodes.  Therefore, the psychotic episode during which

Mickey committed the murders is best explained by a combination of his toxic psychosis caused by

drug and alcohol abuse and his underlying paranoid schizophrenia.

Dr. Burstein's testimony at the evidentiary hearing and in his declaration in support of the

petition was extraordinarily critical of Mickey's trial counsel.

> In sum, I believed and still believe that the performance by Mr. Mickey's two
> attorneys was a mockery of justice.  They were shockingly disorganized, impervious
> to the advice of experts, unwilling to provide their experts with critical information,
> with little or no working knowledge of the facts and issues in the case.  Every aspect
> of the ordeal became a source of profound frustration . . . . both attorneys remained
> unavailable to me at every step, and they consistently failed to provide the materials
> necessary for me to provide meaningful assistance.  They were wholly uninterested in
> learning fundamental mental health principles, without which they were incapable of
> effectively utilizing expert testimony.

Burstein declaration dated August 4, 2000, ¶ 39 ("Burstein decl. ¶ ____").

The court, however, is reluctant to give substantial weight to Dr. Burstein's criticism of counsel

because it seems unreasonably exaggerated and appears to involve opinions beyond those for which

Dr. Burstein had an adequate foundation.  He came across at the evidentiary hearing as an advocate

and not as an expert impartially evaluating the evidence pertaining to mental health issues.  However,

essentially all the members of the defense side were critical of the defense counsels' lack of interest

in and preparation of mental health issues.

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                                       12

United States District Court

For the Northern District of California

Dr. Smith states in a declaration filed supporting Mickey's petition for a writ of habeas corpus that "[i]t was and still is my opinion that Mr. Mickey had significant psychological problems that predated his multiple drug abuse.  However, it was not within my realm of expertise to put a label on those problems." Smith declaration dated August 4, 2003, ¶ 4 ("Smith decl. ¶ ____").  Dr. Smith only renders diagnoses on drug-induced psychiatric disorders.  In cases where the defendant appears to have significant psychological problems apart from drug usage and a dual diagnosis is appropriate, Dr. Smith defers to the appropriate psychiatric expert to render a diagnosis as to the defendant's underlying psychopathology.  If he had been asked to testify in the guilt phase of Mickey's trial, he would have testified that Mickey's long-standing abuse of alcohol and drugs, in combination with his profound thought disorder that pre-dated his drug use, contributed to a diminished mental state at the time of the murders and that

> Mr. Mickey lacked the capacity to conform his conduct to the requirements of the law, he was unable to rationally and meaningfully premeditate or deliberate, he was unable to meaningfully and maturely reflect upon the gravity of his actions . . . . Mr. Mickey did not have the capacity to make reasoned, rational choices about his behavior; instead, his actions resulted from irrational, compelling thoughts.

Smith decl. ¶ 14.

If Mickey's trial counsel had retained Dr. Smith and Dr. Burstein for the guilt phase of Mickey's trial to support a diminished mental capacity defense and had given them access to all available relevant evidence including a detailed life history such as that later prepared by David Lisak, Ph.D. for Mickey's habeas counsel, evidence pertaining to Mickey's long term drug and alcohol abuse and probably his deviant sexual behavior would have come into evidence.  The court finds that trial counsel's decision to not call them in the guilt phase was not the decision that most competent counsel would have made had they known the full scope of the evidence and expert opinions available.

However, the decision not to present a fully developed, diminished capacity defense must be evaluated based upon what trial counsel knew, or should have known, about Mickey's background and mental health as they prepared for trial.  Before counsel made the decision not to call witnesses to support a diminished capacity defense, Mickey had been evaluated at counsels' request by several

1   mental health professionals (Dr. Wipple, Dr. Hutchinson, Dr. Morrison, and Dr. Axelrad).  To hold

2   that counsels' performance fell below the standard of care because they  should have hired additional

3   mental health experts before making a decision on the approach to be taken in the guilt phase would

4   be unreasonable.  As pointed out in *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689.

The decision not to call witnesses and to limit the guilt phase defense to cross-examination of the People's witnesses avoided opening up areas (e.g. long history of drug abuse, sexual misconduct, liklihood of future violent acts) which may not have been well-received by the jury given the environment of the time.  Counsels' approach was not outside the wide range of reasonable professional assistance.

More significantly, counsels' performance did not prejudice Mickey—Mickey has not shown that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the guilt phase of the trial would have been different.  *See id.* at 694.  The evidence of Mickey's guilt was overwhelming.  If Dr. Smith had testified in the guilt phase, he would have faced, as he did in the penalty phase, the difficulty of explaining Blount's murder.

> Q.   I gather from your interview with him you could not determine whether or not his killing of Blount fit into the scheme of separate reality or material reality, is that true.
>
> A.   It would be hard—this religious statement ["now be with God, my child"] would suggest that it fit into the separate reality, but she was not— I talked about that in some detail.  She was not a central focus of his paranoid delusional system; Eric was.
>
> Q.   In fact, she was not a focus of his delusional system at all, isn't that true?

United States District Court

For the Northern District of California

A.      That was the perception that I was given in the interview.  The central focus of the delusional system was Eric.

Reporter's Transcript on Appeal, ¶ 3105:2-3109:2 ("RT _____").  In addition, the People would have undoubtedly questioned whether Mickey was even under the influence of alcohol or drugs at the time of the murders and thus strengthened the premeditated aspect of the crimes.

The court concludes that although a persuasive argument can be made that counsel should have presented a diminished capacity defense, counsel was not ineffective because they made the decision not to do so.

### c.  Presentation of Self-Defense Theory that Was Neither Accurate nor Believable and Conflicted with Mitigation Case

As noted by the California Supreme Court, Mickey offered little evidence in his defense and did not testify.  He argued that the People failed to meet their burden of proof and pointed out why certain witnesses should not be believed.  He argued that the prosecution failed to prove any requisite criminal intent, that he acted in self-defense and that he had diminished capacity as a result of voluntary intoxication.  His defense was not persuasive as there was overwhelming evidence that he killed Hanson and Blount, and the only evidence of self-defense came from Mickey's extrajudicial statements introduced by the People.

Petitioner argues that his trial counsel were ineffective because they tried to argue self-defense and failed to put on a diminished capacity case based upon Mickey's underlying mental diseases (paranoid schizophrenia and toxic psychosis) and that the self-defense claim was inconsistent with the mitigation case.  However, it does not appear that defense counsels' guilt phase argument increased the probability of Mickey's conviction as charged.  Additionally, as stated above, the decision not to put on a diminished capacity defense beyond that which was presented, was not outside the wide range of reasonable professional assistance.

### 3.  Defense Counsels' Guilt Phase Performance Was Not Ineffective

For the reasons stated above, the court concludes that defense counsels' decision to not present a diminished capacity defense of the type now urged by petitioner did not result in a violation of

Mickey's constitutional right to effective representation primarily because the failure did not result in prejudice. Claim 1 is, therefore, denied as to petitioner's claim that he was denied effective assistance of counsel in the guilt phase.

## V. PENALTY PHASE ISSUES

### A. Alleged Ineffectiveness of Counsel (Claim 1)

#### 1. Counsel Has a Duty to Conduct a Thorough Investigation of Defendant's Background and Present and Explain All Mitigating Evidence

In *Correll v. Ryan*, the Ninth Circuit set forth the duty of defense counsel with respect to the penalty phase of a capital case. Although the trial in *Correl* took place in 1984, the same duty existed when Mickey was tried in 1983:

> Counsel has a duty at penalty phase to conduct a thorough investigation of the defendant's background. To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to present and explain the significance of all the available evidence. When it comes to the penalty phase of a capital trial, it is imperative that all relevant mitigating information be unearthed for consideration.

---- F.3d ----, 2006 WL 2796489 (9th Cir. 2006) (internal citations and quotations omitted).

#### 2. Trial Counsels' Alleged Failure to Investigate and Present Substantial Mitigating Evidence

Petitioner is highly critical of trial counsel's penalty phase presentation claiming that substantial mitigating evidence was not presented because trial counsel failed to timely investigate Mickey's entire life history and failed to uncover available mitigating evidence. "'[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.'" *Hovey v. Ayers*, 458 F.3d 892, 929-830 (9th Cir. 2006) (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004)).

#### a. What Trial Counsel Presented in the Penalty Phase

Petitioner's trial counsel called thirty lay witnesses and two experts, Dr. Burstein and Dr. Smith, in the penalty phase. The essence of the defense mitigation case was that Mickey

United States District Court
For the Northern District of California

was a decent, gentle and caring child up until approximately the time his mother died.  His good character was attested to by family, teachers and friends.  After his mother died he engaged in heavy drug use, and he began associating with those involved in the drug culture including Rochelle Schriber, whom he married in 1973.  Schriber introduced Mickey to Hanson.  Dr. Burstein explained that Mickey had a borderline personality disorder which combined with his multiple drug use caused him to become delusional.  Mickey believed Hanson was robbing him of his power and that he needed to contain Hanson's soul in a gourd so Hanson could not hurt him.   Dr. Smith explained Mickey acted in a state of toxic psychosis when he committed the murders.  The defense also called two correctional officers who attested to Mickey's good behavior during pretrial incarceration.  The implication was that Mickey was a different person away from drugs.

Dr. Burstein explained in his testimony that "I was asked to conduct a psychological evaluation of Doug Mickey and to provide feedback to counsel on whether or not he had any psychological problems; if so, what were the nature of those problems." RT 3088:10-13.  Dr. Burstein interviewed Mickey on three separate occasions, obtained a life history, administered four mental health tests and had information that was passed on to him from Dr. Smith.  In the course of Dr. Burstein's explanation of the tests administered to Mickey, counsel asked and Dr. Burstein replied:

> Q.   What does that profile [overall profile from MMPI] show you as far as Doug Mickey's personality or problems are concerned?
>
> A.   It strongly suggests to me that he's a man with very severe psychological problems in many realms, including the ones that are indicated there. And the two that were of most concern to me were the Sc scale and the Pa scale.  The Sc scale is the schizophrenia scale, the Pa scale is a paranoia scale.
> He's considerably elevated beyond what any person free of psychological problems would score on both of those scales and I've picked out some items which he answered . . . .
>
> [Dr. Burstein read a number of Mickey's answers to questions from the schizophrenia and paranoia scales].

1    Q.    Did you tell us what [the schizophrenia scale] measures?

2    A.    Well, I gave some sample responses, and if I didn't what I meant
           to imply is that it is a measure of distorted perceptions, false
3          beliefs, delusions, hallucinations, various things that a person is
           fearful of that tend to be irrational social alienation, and so so
4          (*sic*).   All of those things that typifies (*sic*) schizophrenic
           individuals.

5          * * *

6    Q.    [W]ould you tell us what [the paranoia scale] shows as far as –

7    A.    The paranoia scale is a scale that measures a phenomenon that
8          I think jurors generally are familiar with is the unwarranted
           suspiciousness people have, groundless beliefs that people are
9          following them with the intent to do them harm, have wired their
           homes, and so on . . . .

10   RT 3105:2-3109:2.

11        Dr. Smith explained that Mickey had major psychological problems that predated his
12   use of drugs.  Dr.  Smith said the interaction between Mickey's underlying psychological
13   problems and his history of abuse of drugs, combined with his reading of Hindu religious
14   material and later the Carlos Castenada series, popular in the drug culture, established the
15   foundation for an elaborate and long standing psychotic delusional system.  He started believing
16   that Hanson was robbing him of the power he needed to become a spiritual warrior.  Dr. Smith
17   concluded that at the time of the murders, Mickey "was a psychiatrically disturbed polydrug
18   abuser, abusing at the time of the crime alcohol and marijuana, and that he had a polydrug
19   induced paranoid schizophrenic like reaction." RT 2927:9-12. "[H]is mental capacity was
20   severely impaired as a consequence . . . ." RT 2927:19-20.

21        No evidence was offered suggesting that Mickey grew up in a dysfunctional family
22   or that any of his family members were abusive, were alcoholics or suffered from mental
23   illnesses.

24        Defense counsel summarized the mitigation case for Mickey in their penalty closing
25   argument.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

These tragic killings were an isolated incident . . . . They weren't part of a pattern of violent behavior.

The evidence in the penalty phase is all to the contrary. Before he became involved in the use of alcohol and drugs, he was described by more than a dozen witnesses . . . that said he was a good boy, a hard worker, he was reliable and helpful, courteous, friendly, considerate, trustworthy, artistic, sensitive, gentle, and that he avoided violence.

What happened to that boy? What changed his personality and led to these tragic killings?

The evidence was presented by the defense, and it showed that he had many tragic experiences in his family. His half brother, Randall, was killed when he was very young. His mother, Dorothy, was killed when he was about 18. He suspected that she committed suicide, and he felt responsible even though he was not there. His brother Ron committed suicide some time later, after the mother died.

* * *

Now, the evidence clearly showed that, after his mother died, he started to drink alcohol. One of the witnesses testified that he showed shock and blamed himself for her death.

Now, shortly after that, he started using marijuana, and from time to time he let his hair and beard grow. Then he'd shave it off and let it grow again, and he began to take up with the drug culture, counter-culture that's so familiar to all of us.

Now, his wife Rochelle introduced him to Eric Hanson, and he regressed further from marijuana and knew such dangerous drugs as, LSD, commonly known as acid; PCP, angel dust; psilocybin, which comes out of mushrooms; and peyote, which, I think, also comes out of mushrooms. He continued his use of hashish and marijuana.

The evidence showed that he became more and more involved with Eric; that they went---tried to go into business together to grow a million dollars worth of marijuana. They were engaged in a woodcutting enterprise. They had discussions of religion and far-eastern beliefs, but Doug used these drugs not for recreation, but for mind expansion, to seek the truth, sort of semi-religious, I guess. His personality was fairly altered by those drugs, and his release became delusional.

Now, our experts have testified that he became delusional because of the toxic effects that these drugs had on his body and brain.

Why doesn't everyone who takes that type of drug develop toxic psychosis?

Dr. Burstein indicated that the toxic psychosis was added to a personality---I think he called it borderline personality disorder, which is a condition independent of toxic psychosis; that is to say, if he hadn't already had the borderline personality disorder, the toxic psychosis would not have had such a marked effect on his conduct or on his thinking. Now, he developed delusions of false beliefs which contributed to the case of this present story.

* * *

. . . [Dr. Burstein] described some of the beliefs that Doug had developed as a result of his toxic psychosis and borderline personality disorder.

Doug thought that Eric Hanson had stolen his marijuana crop the year before; that he was responsible for his clothes being stolen after making a telephone call to either Japan or Hawaii. He thought Eric was responsible for

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                                    19

the failure of his restaurant job in Alaska and had the deluded belief that Eric
was commanding him to come to California, to leave his family and come to
California.

[Dr. Bernstein] said Doug thought he could control pain, thought he
could stop bleeding with his own mind. He thought he could run sideways on
a hill, in defiance of gravity, and he thought Eric as somehow draining his
energies at long range, using him for some nefarious purpose, and that
somewhere along this line, Doug got to thinking he had to kill Eric Hanson to
protect himself and his family.

That's sort of delusional psychic self-defense, if you please. That made
it easier for him to lie to Curtis Landry and give a self-serving statement of self-
defense, which you will remember we did not urge.

He said that Doug told him he believed he was a spiritual apprentice and
that Eric betrayed him, and he couldn't give any evidence of what that betrayal
consisted of. He began to collect shells and obtained the necklace of power.

* * *

He said he performed rituals. He had a gourd with eyes on it with which
he was going to contain Eric's soul so he couldn't harm Doug.

Now, that indicates that his personality disorder, independent of toxic
psychosis, was serious and probably still is serious as far as his thinking was
concerned.

* * *

Dr. Burstein thought that robbery and financial gain were probably
secondary because of Doug's toxic psychosis and because of his borderline
personality disorder at the time.

RT 3925:7-3931:21. Based upon the evidence outlined in counsels' argument, the defense

requested that Mickey's life be spared.

### b. What Trial Counsel Could Have Investigated and Presented

Petitioner asserts a multitude of complaints about his counsels' penalty phase

preparation. He contends that the investigation for the mitigation case was a last-minute,

inadequate one which was in large part delegated to non-lawyers. Petitioner maintains that

relevant, available mitigating evidence was not obtained and the experts worked with

incomplete information. Petitioner argues that trial counsel were therefore unable to explain

the significance of his background and make a compelling mitigation presentation.

Many of petitioner's complaints constitute second-guessing defense counsels'

performance in light of the fact that the verdict was a death sentence. "Judicial scrutiny of

counsel's performance must be highly deferential. It is all too tempting for a defendant to

second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                                                    20

United States District Court

For the Northern District of California

1  a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

2  particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.  As aptly

3  put in *Smith v. Mitchell*, the court's role on habeas review "is not to nitpick gratuitously

4  counsel's performance.  After all, the constitutional right at issue here is ultimately the right to

5  a fair trial, not to perfect representation."  348 F.3d 177, 206 (6th Cir. 2003).

6        Two aspects of defense counsels' performance, however, "fell below an objective

7  standard of reasonableness": (1) counsels' failure to marshal and present evidence that Mickey

8  grew up in a dysfunctional family where he was abused and surrounded by individuals with

9  alcohol and mental health problems and that Mickey himself was a psychiatrically disturbed

10 individual who suffered delusions before he began abusing drugs; and (2) counsels' failure to

11 effectively utilize the expertise of their mental health experts, Dr. Burstein and Dr. Smith, in

12 both the preparation and presentation of petitioner's mitigation case and in rebutting the

13 People's case.

### I.  Failure to Marshal and Present Evidence That Mickey Grew up in a Dysfunctional Family and Was a Psychiatrically Disturbed Individual with Profound Thought Disorder Predating His Drug Abuse

16       Mickey needed to present some mitigating explanation for his actions given the brutality

17 and apparent motives for the murders.  Counsel faced a difficult challenge because a

18 presentation that Mickey was a long-time poly-drug abuser would likely result in little

19 sympathy for Mickey.  Therefore, to effectively represent Mickey in the penalty phase,

20 Mickey's life story had to be told in a way that would gain some sympathy with the jury and

21 explain why he committed the murders.  To some extent, Mickey's trial counsel argued what

22 could have been a significant part of an effective mitigation presentation, specifically that

23 Mickey was psychiatrically disturbed before he began his long standing drug abuse.

24       Why doesn't everyone who takes that type of drug develop toxic
         psychosis?
25       Dr. Burstein indicated that the toxic psychosis was added to a
         personality---I think he called it borderline personality disorder, which is a
26       condition independent of toxic psychosis; that is to say, if he hadn't already had

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

C-93-0243 RMW                                    21

1    the borderline personality disorder, the toxic psychosis would not have had such
     a marked effect on his conduct or on his thinking.

2
RT 3926:19-3927:2.

3
     The problem, however, with the argument that counsel made is that the only evidence

4
presented that Mickey was psychiatrically disturbed before the onset of his drug abuse came

5
from the doctors who had only Mickey as their source of evidence.  On cross-examination, Dr.

6
Burstein testified:

7
            Q.    Doctor, have you been able to ever find in sources outside
8                 Mickey, any witnesses, such as Mr. Mickey's former wives,
                  friends, or even in the interview with Detective Landry,
9                 evidence of this alleged thought or delusion that Eric Hanson
                  was in some way controlling him?

10
            A.    I had a problem with that.  This is one of the few cases in which
11                I've not been able to interview significant others.  It's typical for
                  me to interview persons who knew his as well that most of his interactives, individuals who had and I
12          was told that the three wives, or at least the one, Allison, was in Japan.  So it was my
            impression that there was no one available locally for me to interview that could have been
13          useful in confirming or disconfirming what Doug had told me.

14                * * *

15          Q.    Did you think that that was something that would be important
                  in determining whether or not you should rely on Mr. Mickey's
16                say so suffering delusional beliefs, to try to find some evidence
                  for it in external sources?

17          A.    Oh yes.  Absolutely.

18
RT 3191:14-3192:1.

19
     Dr. Smith was asked on cross-examination: "What information did you have, if any,

20
about the existence of any delusional beliefs or paranoid delusional system of beliefs by Mr.

21
Mickey before you interviewed him?  A[nswer] None."  RT 2959:11-14.  This cross-

22
examination was particularly devastating since the prosecutor was able to show many examples

23
of information obtained from Mickey that were inconsistent with other evidence in the case.

24
For example, Dr. Burstein assumed from the information he had that Mickey had consumed

25
large quantities of alcohol and marijuana immediately before the time of the murders.  The

26

27
ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
28
C-93-0243 RMW                                    22

**United States District Court**

For the Northern District of California

1    prosecution asked Dr. Burstein many questions about Mickey's acts on the night of the murder

2    that suggested Mickey was not highly intoxicated.  Dr. Burstein had to admit he was not aware

3    of those acts and that if Mickey had not consumed large amounts of marijuana and alcohol "[i]t

4    would certainly preclude the diagnosis of toxic psychosis." RT 3180:26-28.

5    However, if counsel had conducted a thorough investigation, they would have

6    uncovered substantial, independent evidence that Mickey was a psychiatrically disturbed

7    individual before he began to abuse drugs and that he had suffered delusions years before the

8    murders.  They would also have learned that Mickey grew up in an abusive, dysfunctional

9    family with members who had significant mental health issues.  If Dr. Burstein and Dr. Smith

10   had been provided that information, they would have been able to cite evidence that came other

11   than from Mickey in support of their opinions.  In fact, Dr. Burstein who has reviewed available

12   evidence that he was not provided before he testified now believes that Mickey probably suffers

13   from and did suffer from paranoid schizophrenia at the time of the murders.

14   Both Dr. Burstein and Dr. Smith were frustrated by counsels' failure to provide

15   necessary information to them.  Counsel has an affirmative duty to provide mental health

16   experts with information needed to develop an accurate profile of the defendant's mental health.

17   *See Caro v. Calderon*, 280 F.3d 1247, 1255 (9th Cir. 2002).  Dr. Burstein states in his

18   declaration that defense counsel, despite requests, failed to provide police reports and records

19   of key witness interviews such as the statement of Ed Rogers and the names and addresses of

20   Mickey's ex-wives.  Counsel also failed to provide the results of an MMPI conducted in 1981.

21   Although Dr. Burstein does not identify anything specific in the police reports or statements

22   of Rogers that would have been helpful except that they would have shed light on Mickey's

23   behavior on the night of the crimes and over time, he would not have been so vulnerable on

24   cross-examination to questions that showed that he based his opinion on questionable facts

25   obtained from Mickey and lacked information he agreed would have been helpful.  The

26   prosecution persuasively suggested that Dr. Burstein's and Dr. Smith's opinions were based

27   ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
     PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28

United States District Court

For the Northern District of California

1  upon uncorroborated information obtained from Mickey himself and that Mickey was a drug

2  abuser whose testimony was not reliable or truthful.

3        Dr. Burstein declares that information available from Mickey's second wife, Rochelle

4  Schreiber [Packard], whom he was not advised was available for interview, would have been

5  very significant to him.  Schreiber could have provided :

6        . . . insights and observations that not only corroborate some of Mr. Mickey's
      self-reports, but also reveal his ongoing emotional struggles, functional and

7        emotional deterioration and, in some instances, evidence of disturbed thought
      processes.  In particular, Ms. Packard's knowledge of Mr. Mickey's bizarre

8        behavior and drug use, which she observed several years prior to the offense and
      trial, would have been critically important to my evaluation and testimony. Her

9        knowledge and observations would have confirmed the nature and extent, as
      well as the longevity, of Mickey's drug abuse, disturbed thought processes, and

10        bizarre behavior and buttressed my testimony at the penalty phase.  Her
      knowledge and observations were especially critical in demonstrating the

11        longevity of his impairments, thus providing essential information about the
      course of his illness.

12  Burstein decl.  ¶ 13.

13        Dr. Smith in his declaration in support of the current petition explains that he was given

14  very limited materials to review although he had asked for objective verification of Mickey's

15  drug use but was told there was none available.  He has since learned that Navy discharge

16  records showed Mickey received a medical discharge from the Navy after admitting drug use.

17  He also asked counsel to obtain external, objective verification of Mickey's delusional thought

18  processes.  He did not have such evidence at trial but has now learned that letters written by

19  Mickey between October 21, 1980 and January of 1981 were available and contained pictures

20  Mickey had drawn of gourds with differing facial expression to symbolize himself and capture

21  his moods.  A photograph was also available that shows a home-made altar with candles,

22  figures of animals, shells and several necklaces arranged in a purposeful fashion.  The

23  photograph corroborates Mickey's descriptions to Dr. Smith of the rituals Mickey engaged in

24  and his delusion that gourds could hold an individual's spirit.

25        The prosecution presented the testimony of Kate B. Yago, M.D., a psychiatrist, who

26

27  ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28

United States District Court

For the Northern District of California

1  explained that she reviewed the packet of letters written by Mickey dating from October of

2  1980 through the end of January of 1981 (the ones Dr. Smith did not have when he testified)

3  and spoke with Mickey's then wife Allison and found no evidence of delusional thinking.  In

4  fact, Dr. Yago testified that the evidence suggested Mickey seemed quite lucid.  Dr. Smith at

5  the time he testified did not have the letters or know Dr. Yago's opinion and thus had no

6  opportunity to rebut Dr. Yago's testimony.

7      Trial counsel portrayed Mickey as essentially a good, hard-working boy who had a

8  healthy and close relationship with his mother and grew up in an essentially normal

9  environment.  Available evidence would have shown otherwise.  Trial counsels' last minute

10  preparation failed to uncover the evidence.  Beth Bonora and Lois Heaney of the National Jury

11  Project were retained in January of 1983 to assist with jury selection.  When they first met

12  Mickey they felt he had serious mental and emotional problems.  When Bonora and Heaney met

13  with counsel for the first time on March 18, 1983, they realized that little had been done to

14  prepare the penalty phase.  Trial was scheduled to start in May 1993.  They urged counsel to

15  prepare a social history of petitioner's life and background from which a penalty phase theme

16  could be developed and witnesses identified and chosen.

17      In April 1983, Mickey's trial counsel retained Jeanette Gurevich, a social worker intern,

18  to prepare a social history.  Counsel told Gurevich to get the social history from Mickey and

19  give the names of any potential witnesses to Milton Moeschler, the defense investigator, rather

20  than interview them herself.

21      Defense counsel made several largely unsuccessful motions to continue the trial

22  acknowledging that they were not prepared for the penalty phase.  Just prior to the start of jury

23  selection, trial counsel gave Milton Moeschler, their investigator, a list of potential witnesses

24  for the penalty phase and told him to locate and interview them.  On May 15, 1983, trial counsel

25  gave Moeschler the State's list of thirty-four trial witnesses and asked him to interview them.

26  On June 6, 1983, Gurevich gave Moeschler a list of thirty-nine potential penalty phase

27  ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28  C-93-0243 RMW                                        25

United States District Court

For the Northern District of California

witnesses.  Moeschler was unable to contact all of the witnesses, in part because he was injured in an automobile accident.  Petitioner contends that a number of witnesses were not contacted who could have provided relevant information for the penalty phase, including Sheila Roberts, the former wife of Ronnie Mickey, petitioner's brother who committed suicide, and Nancy Tall, petitioner's first wife.  Petitioner asserts that counsel did not personally interview some witnesses, and, in particular, failed to obtain an abundance of available important social history information from petitioner's second wife, Rochelle Packard Schreiber.

Petitioner asserts that his trial counsel did not obtain a detailed social history which could have been relied upon by Dr. Smith and Dr. Burstein to support their opinions.  Such a life history was prepared by David Lisak, Ph.D., who was retained by petitioner's counsel in 1995.  Dr. Lisak is a forensic psychologist who teaches at the University of Massachusetts and also has a clinical practice.  He focuses on the relationship between child abuse and the impact of abuse on males later in life.  He has been retained by the defense in thirty-six capital cases.  Dr. Lisak was asked "to identify and assess the social, development, psychiatric, familial, and life experience factors that shaped Doug Mickey's personality and emotional development, and that influenced his behaviors and mental states at critical stages in his adult life."  Lisak declaration dated June 3, 1995, ¶ 6 .  Dr. Lisak compiled a social history of Douglas Mickey.  Based on interviews with Mickey, reviews of interviews with many people acquainted with Mickey and a review of  numerous documents relating to Mickey's life, Dr. Lisak concluded that the Mickey family was profoundly dysfunctional.  Both parents were alcoholic.  There was a history of neglect.  Mickey and his mother suffered from depression.  His father was distant, violent and unpredictably abusive.  Mickey's mother died unexpectedly as a result of an accident or suicide when Mickey was 17 years old.  Acquaintances including a high school teacher report that Mickey was devastated.  Mickey's father remarried within less than five months and when his new wife and her daughter moved in, Mickey's bedroom was given to the daughter.  Within fifteen months of Mickey's mother's death, Mickey's grandfather died and

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

C-93-0243 RMW                                    26

1    then less than two years later, his brother Ronnie committed suicide.

2         Mickey had an abnormal, sexualized relationship with his mother that crossed over at

3    one point to an incestuous act.  Dr. Lisak noted Mickey's history of deviant sexual behavior,

4    including exposing himself and molesting girls who were left in his charge.  He believes that

5    this behavior is consistent with Mickey's own history of abuse and corroborates Mickey's

6    incestuous relationship with his mother.

7         Dr. Lisak did not make any diagnosis of Mickey's mental health at the time of the

8    murders of Eric Hanson and Cathy Blount.  Nevertheless, he believes that Mickey viewed

9    Hanson in the same way that petitioner viewed his mother—the relationship was based on a

10   similar power struggle.  He believes that Mickey's incestuous relationship with his mother

11   contaminated all of his other relationships—it was the origin of his relationship with Hanson.

12   Because his mother died when he was only 17, Mickey was never able to differentiate himself

13   from her.

14        Whether defense counsel should have presented Dr. Lisak's theory that Mickey viewed

15   Hanson in the same way as he viewed his mother and that Mickey's incestuous relationship with

16   his mother contaminated all of his other relationships seems problematic.  Counsel had chosen

17   to keep from the jury evidence of the sexual misconduct of Mickey and that decision was a

18   reasonable tactical one even though Dr. Lisak felt it was an illustration of how Mickey's

19   mother's conduct had affected him.  Mickey's sexual conduct could have alienated a jury even

20   if it was caused in part by his mother's incestuous behavior.  However, what Dr. Lisak did

21   provide was a wealth of information showing that through no fault of his own, Mickey grew

22   up in a dysfunctional, abusive household.  This information would have enabled Dr. Smith to

23   explain that:

> Studies confirm a strong correlation between a genetic history of addictive
> disorders and predisposition to developing addictions.  In fact, if one or more
> parents is an alcoholic, an individual's chances of developing an addictive
> disorder increases four times . . . .  Dr. Lisak's social history . . . offers insight
> into the severity of the addictions within Mr. Mickey's family and the manner

United States District Court

For the Northern District of California

in which the family dynamics were distorted by alcohol and drug abuse.  The social history also documents the dysfunctional and unstable environment that contributed to or caused Mr. Mickey's own mental impairments and alcohol and drug use.  Mr. Mickey's genetic loading, combined with his family environment and underlying mental illness, caused him to be predisposed to alcohol and drug dependency.

Smith decl. ¶ 20.

In summary, what defense counsel presented was a mitigation case that essentially portrayed Mickey as one who had a relatively normal childhood, was a good young man until he started to abuse alcohol and drugs following the death of his mother to whom he was very close.  Although the defense mental health experts opined that Mickey had an underlying psychiatric condition that pre-dated his drug abuse, there was little, if any, evidence offered to support that opinion except for information related by Mickey himself to Dr. Burstein and Dr. Smith.  Counsel's argument that Mickey had an underlying psychiatric disease and that the murders were committed by Mickey in a state of toxic psychosis was effectively challenged by the cross-examination of Dr. Burstein and Dr. Smith showing that they did not have facts to corroborate their opinions other than some coming from Mickey himself, were missing important types of information, and had some facts that appeared to be in error such as the state of Mickey's sobriety at the time of the murders.

What could have been presented was a portrayal of Mickey's childhood in a dysfunctional family giving specific examples of dysfunctional behavior.  The defense could have presented a mitigation case that Mickey was a psychiatrically disturbed individual who was exposed to abuse and surrounded by family members who had psychiatric problems themselves.  Counsel could have explained through witnesses why Mickey got to a point where he was in an unreal, delusional state and committed the murders, as Dr. Smith declared, "during a major break with reality" when he was subject to delusions, paranoia with ideas of reference, distorted thinking and a loss of contact with reality."  Smith decl. ¶ 13.  The magnitude of the discrepancy between what defense counsel did investigate and present and what counsel could

have investigated and presented was substantial. Counsel's performance fell below the standard of care defined in *Hovey*, *supra*.

### ii. Failure to Effectively Utilize the Expertise of Their Mental Health Experts

Although Dr. Smith and Dr. Burstein were aware of each other's involvement in the case, counsel made no effort to have them work as a team. As explained by Dr. Smith:

> My standard approach was then, and still is, much different than the way work was done in the Mickey case. My standard is a team approach where I and the other experts, such as psychologists and psychiatrists, work together. We consult with each other and discuss our separate findings so that each member of the team learns from other members and knows what each other is doing. I have found, during my extensive career, that this type of collaborative approach is the best way to present expert testimony. The interchange of ideas in this kind of collaborative effort provides a greater arena of knowledge which facilitates the presentation of each expert's opinion in his or her area of expertise. This type of approach is especially important in a case such as Mr. Mickey's where the individual suffers both substance abuse and psychiatric disorders.

Smith decl. ¶ 9. Dr. Burstein and Dr. Smith never even spoke to one another during their involvement on Mickey's case. Since Dr. Smith does not testify outside his area of expertise and defers to another psychiatric expert with respect to the diagnosis of psychological problems apart from those resulting from drug usage, a team effort was particularly important. The presentation of Mickey's mitigation case could have been substantially improved by providing all available materials to the two doctors and coordinating a team effort between them because a critical factor in Mickey's case was the dual nature of his mental health issues.

The defense case was particularly devastated by the unrebutted testimony of the People's psychiatric expert, Dr. Yago. The prosecution had provided Dr. Yago with statements and testimony that were available to defense counsel but never seen by Dr. Burstein or Dr. Smith. The prosecution had Dr. Yago sit through the testimony of Dr. Burstein and Dr. Smith. In contrast, defense counsel not only failed to have either Dr. Burstein or Dr. Smith listen to Dr. Yago's testimony, they never even consulted with either of them about their views on her opinions. Therefore, Dr. Yago's testimony was not effectively challenged. Dr. Burstein has

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                                                    29

United States District Court

For the Northern District of California

1    now reviewed her testimony and strongly disagrees with much of it.  Mickey's defense counsel

2    clearly failed to meet the standard of care by failing to utilize their own experts to rebut and

3    challenge the prosecution case.

4           Dr. Yago testified that she had reviewed Mickey's letters written between October 1980

5    through June of 1981 and found no evidence of delusional thinking—Dr. Smith has now seen

6    the letters and disagrees ("Mr. Mickey's correspondence . . . corroborates his delusions,

7    specifically his ideas regarding the use of gourds to hold an individual's spirit.  Throughout his

8    letters, Mr. Mickey drew pictures of gourds with differing facial expressions to symbolize

9    himself and capture his mood or feelings." (Smith decl. ¶ 19)).

10          Dr. Yago had spoken with Allison, Mickey's third wife, and she denied that Mickey was

11   heavily involved with drugs between January 1979 and October 1980.  Dr. Burstein was told

12   Allison was not available.  Further, Dr. Burstein has now seen Dr. Lisak's report and the

13   declarations of other significant people in Mickey's life which reveal, with specific examples,

14   Mickey's psychological deterioration from his early adult years through the time of his arrest.

15   The report and declarations show Mickey's troubled and abusive childhood, his longstanding

16   dependence on alcohol, marijuana, LSD and other mind-altering drugs, and his increasingly

17   bizarre and ritualistic behaviors.  This information would have corroborated the testimony of

18   Dr. Burstein and Dr. Smith and contradicted Dr. Yago's opinions and the bases therefore.  It

19   also would have raised doubt about the accuracy of the report from Allison that Mickey's drug

20   usage was somewhat limited.

21          Dr. Yago claimed that Dr. Smith's description of Mickey as having a "schizophrenic-like

22   reaction" was a description made up by Dr. Smith but not one that is generally accepted or used

23   by psychiatrists to describe a recognized syndrome.  She further stated that she disagreed with

24   Dr. Smith's appraisal that Mickey was suffering from a poly-drug abuse induced paranoid

25   schizophrenic-like reaction at the time of the murders.  "[I]t is extremely rare, if not totally

26   unheard of, that no one would hear about his symptoms, or no one would hear from him

27   ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28   C-93-0243 RMW                                30

United States District Court

For the Northern District of California

1   directly, meaning family, friends, acquaintances." RT 3333:10-13. "I can find no evidence . .

2   . to indicate to me that he ever had that delusional belief system in the years he has stated that

3   he did have it." RT 3333:18-24. "It is also extremely rare that someone who was that greatly

4   impaired would not end up in a hospital at some point." RT 3334:12-14.

5          Dr. Burstein could have rebutted Dr. Yago's assertion that Mickey's alleged failure to

6   display evidence of delusional thinking before the murders casts doubt on Dr. Smith's

7   assessment of Mickey's condition.  However, he was not asked to do so.  If he had been asked

8   and properly prepared, he could have explained that Mickey spent most of his adult life

9   somewhat removed from society living in rural areas within various subcultures surrounded by

10  others with their own drug abuse and other problems.  "Mr. Mickey's lifestyle made it far more

11  likely that his condition would go undetected or be dismissed as simply odd."  Burstein decl.

12  ¶ 14.  Dr. Burstein also would have been able to describe Dr. Yago's view that a psychotic

13  individual will reveal his delusions as simplistic, inaccurate and not substantiated.  Finally, Dr.

14  Burstein could have pointed out, as he learned when contacted concerning Mickey's habeas

15  claim, that Mickey did reveal both delusional thinking and bizarre behavior to Rochelle

16  Packard.

17         Dr. Yago also pointed out an inconsistency between Dr. Smith and Dr. Burstein as to

18  whether Mickey had to have been acutely intoxicated at the time of the murders to be properly

19  diagnosed as suffering with toxic psychosis at the time of the murders.  This conflict could have

20  been avoided, or at least explained, if Dr. Smith and Dr. Burstein had worked as a team.

21  Although Dr. Yago agreed with Dr. Smith that acute intoxication was not necessary for the

22  diagnosis, she disagreed that Mickey was so suffering at the time of the crimes.  She explained

23  that the "meticulous way in which he went about this crime, the preplanning of the crime, the

24  elaborate lengths he took to protect himself once he committed the crime" all suggest he was

25  not suffering from toxic psychosis.  RT 3336:26-3337:3.

26         Dr. Yago also explained that she does not believe that Mickey had a borderline

27  ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
    PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28  C-93-0243 RMW                                    31

1   personality disorder as originally suggested by Dr. Burstein but rather an atypical personality

2   disorder. Regardless of the correct personality disorder, Dr. Yago testified that such disorders

3   do not mean that one's ability to judge right and wrong is impaired or that the person is

4   suffering from severe emotional distress. It rather means that they are likely to have

5   "difficulties with their personality function which impairs them . . . usually at work or at home

6   . . . ." RT 3349:10-14.

7           In light of information obtained in connection with the current habeas proceedings, Dr.

8   Burstein believes that Mickey probably suffered from paranoid schizophrenia at the time of his

9   offenses.

> The question is whether I think it's still toxic psychosis or more clearly paranoid schizophrenia.
>
> I think it's much more likely to be schizophrenia, and I think he did have a borderline personality then, and still has one now.
>
> Q.  So what is---what would your current diagnosis be?
>
> A.  Well, . . . to say what my diagnosis would be of a man I haven't seen in 21 years, so this would be a provisional diagnosis.
>
> But I've been very persuaded . . . that it's quite probable that I would more likely find it paranoid schizophrenia . . . .

17  RT 765:5-21. Although Dr. Burstein's diagnosis of paranoid schizophrenia is only provisional

18  and based in part on Dr. Stonefeld's diagnosis which was not available to Dr. Burstein at the

19  time of Mickey's trial, the bottom line is that the defense mitigation evidence presented

20  portrayed Mickey as one who probably induced his own psychotic symptoms, when there was

21  significant available evidence which had not been gathered to support a conclusion that Mickey

22  was a delusional individual burdened by a mental sickness. A jury is certainly more likely to

23  be sympathetic with one who has an illness for which he is not responsible than one who

24  induces his own psychotic symptoms by ingestion of drugs. Defense counsel's failure to

25  provide their experts with all reasonably available background material, failure to work with

26  them as a team, and failure to have them listen to and rebut the prosecution mental health expert

1     fell below acceptable standards.

2                            **c. Prejudice to Petitioner**

3          Although Mickey's defense counsel's representation fell below an objective standard of

4     reasonableness, Mickey's constitutional rights were not violated unless such performance

5     prejudiced him. There must be a probability sufficient to undermine confidence in the

6     appropriateness of a death sentence. *See Strickland*, 466 U.S. at 693. The Ninth Circuit has

7     observed that "[e]vidence regarding social background and mental health is significant, as there

8     is a 'belief, long held by this society, that defendants who commit criminal acts that are

9     attributable to a disadvantaged background or to emotional and mental problems, may be less

10    culpable than defendants who have no such excuse.'" *Allen v. Woodford*, 395 F. 3d 979,1005

11    (9th Cir. 2005) (quoting *Douglas v. Woodford*, 316 F. 1079, 1090 (quoting *Boyde,* 494 U.S. at

12    382, *cert. denied,* 540 U.S. 810 (2003)). In *Allen*, the failure of trial counsel to prepare for the

13    sentencing phase until a week before that phase began, and his resulting failure to thoroughly

14    investigate and present Allen's mitigation case, was constitutionally deficient. However, while

15    counsel erred in failing to investigate and present the potential mitigation testimony of many

16    family members, friends, and associates of Allen's that Allen could be pleasant, the court found

17    no prejudice. There was not a reasonable probability that had trial counsel presented the

18    potential mitigation evidence, the jury would have weighed the evidence in favor of a life

19    sentence for Allen whom it had just convicted of murdering three people and conspiring to

20    murder four others while he was serving a life sentence for yet another murder. In contrast

21    here, the potential mitigating evidence would have shown that Mickey's crimes could be

22    attributable to a disadvantaged background and to emotional and mental problems.

23         Mickey's jury may not have been persuaded by the potential mitigating evidence that

24    Mickey should have received a life sentence. The People offered significant evidence of

25    premeditation and the potential mitigating evidence leaves little explanation for Blount's

26    murder. Nevertheless, as pointed out by the Supreme Court in *Strickland*, "[t]he result of a

27    ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
      PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28    C-93-0243 RMW                              33

United States District Court
For the Northern District of California

1  proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors

2  of counsel cannot be shown by a preponderance of the evidence to have determined the

3  outcome." 466 U.S. at 694.

4      Trial counsels' representation of Mickey in the penalty phase fell below an objective

5  standard of reasonableness and that representation prejudiced Mickey.

6      **3. Defense Counsels' Penalty Phase Representation Was Ineffective**

7      For the reasons stated above, the court concludes that defense counsels' penalty phase

8  representation was ineffective and prejudicial.  Claim 1 is, therefore, granted as to petitioner's

9  claim that he was denied effective assistance of counsel in the penalty phase.

10      **VI.  CERTIFICATE OF APPEALABILITY**

11      An appeal may not be taken to the court of appeals from the final order in a habeas

12  corpus proceeding in which the detention arises from a state court judgment. 28 U.S.C. § 2253.

13  A certificate of appealability may issue only if the applicant has made a substantial showing of

14  the denial of a constitutional right. *Id.*  The court must indicate which specific issue or issues

15  satisfy the showing required. *Id.*

16      In this case, the court finds that Mickey has made a substantial showing of the denial

17  of a constitutional right on his ineffective assistance of counsel claims set forth in Claim 1 with

18  respect to both the guilt phase (failure to raise diminished mental capacity defense) and penalty

19  phase (failure to investigate and present substantial mitigating evidence).  In order to obtain a

20  certificate of appealability, the petitioner must show only that reasonable jurists could debate

21  whether the petition should have been resolved differently or that the issues presented deserve

22  encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Beardslee*

23  *v. Brown*, 393 F.3d 899, 901 (9th Cir. 2004).  That showing has been made with respect to

24  Claim 1.  It has not been made with respect to Claim 9 or any of the claims for which summary

25  adjudication was granted by the Order Granting in Part and Denying in Part Respondent's

26  Motion for Summary Judgment filed May 6, 2002.  This current order and the May 6, 2002

27  ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
   PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28  C-93-0243 RMW                          34

1   summary judgment order explain why petitioner's claims other than Claim 1 lack merit and thus

2   do not call for a certificate of appealability.

3          The court orders that this case be remanded to the Superior Court for the County of San

4   Mateo for a new trial on the penalty phase.  The remand order, however, is stayed pending

5   appeal.

6          IT IS SO ORDERED.

7   DATED: 11/17/06

8

9   _Ronald M Whyte_
    _____

10  RONALD M. WHYTE
    United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN
    PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY

28  C-93-0243 RMW                          35

*United States District Court*
For the Northern District of California

1  Copy of Order Mailed to and E-Filed on 11/17/06:

2  J. Frank McCabe
   500 Sansome Street, Ste.212
3  San Francisco, CA 94111

4  Dane R. Gillette
   Senir Assistant Attorney General
5  455 Golden Gate Avenue, Ste. 11000
   San Francisco, CA 94102-7004
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY
C-93-0243 RMW                36